# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| Cody A. Nedved, Derivatively on Behalf of BP PLC,<br><br>                     Plaintiff,<br><br>    v.<br><br>ANTHONY B. HAYWARD, IAIN C. CONN, ROBERT W. DUDLEY, BYRON E. GROTE, ANDY G. INGLIS, CARL-HENRIC SVANBERG, PAUL M. ANDERSON, ANTONY BURGMANS, CYNTHIA B. CARROLL, SIR WILLIAM M. CASTELL, GEORGE DAVID, IAN DAVIS, DOUGLAS J. FLINT, DEANNE S. JULIUS, H. LAMAR MCKAY, TRANSOCEAN LTD., TRANSOCEAN DEEPWATER, INC., TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC., CAMERON INTERNATIONAL CORPORATION, HALLIBURTON ENERGY SERVICES INC., "TA" through "TZ" INSURANCE COMPANIES AS INSURERS OF TRANSOCEAN, "CA" through "CZ" INSURANCE COMPANIES AS INSURERS OF CAMERON INTERNATIONAL, AND "HA" through "HZ" INSURANCE COMPANIES AS INSURERS OF HALLIBURTON,<br><br>                    Defendants,<br><br>    and<br><br>BP PLC,<br><br>                  Nominal Defendant. | Civil Action No.<br><br>Section<br><br>Magistrate<br><br><br>**Jury Trial Demanded** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Cody A. Nedved  ("Nedved"), by his undersigned attorneys, submits this

Verified Shareholder Derivative Complaint ("Complaint") in the name and on behalf of nominal

Defendant  BP PLC ("BP" or the "Company") against certain directors and officers of BP and

other defendants (collectively, "Defendants").  Plaintiff bases its allegations on, among other

things, actual knowledge as to its own acts, public statements by officers and officials of BP,

SEC filings, and testimony taken at joint hearings held by the United States Coast Guard and the

Minerals Management Service ("MMS") and before the United States Congress, and on

information and belief as to all other allegations after due investigation by its counsel.

## SUMMARY OF THE ALLEGATIONS

1.      This derivative lawsuit arises from the disastrous consequences of Defendants'

long-implemented choice to maximize output at the Company's production facilities instead of

ensuring that the Company complied with safety regulations. The failure of the BP Board of

Directors (the "BP Board", the "Board of Directors" or the "Board") and certain officers of BP to

comply with their fiduciary duties and the improper conduct of the other defendants has caused

the worst oil spill in the history of the United States – surpassing the Exxon Valdez disaster --

leaving 11 men dead, contaminating thousands of square miles of marine life and causing

billions of dollars in harm to coastal businesses and residents, as well as to BP itself.

2.      The explosion and sinking of the Deepwater Horizon oil rig (sometimes referred

to hereinafter as the "Rig") has caused oil to gush into the Gulf of Mexico at a rate of

approximately 20,000 to 60,000 barrels per day, and as of this filing continues, with BP Plc now

estimating a worst case scenario of 100,000 barrels per day.

3.      BP is the major deepwater driller in the Gulf of Mexico.

4.      While drilling for oil is a dangerous enterprise, the BP Board has known for years

– indeed, decades – that deepwater drilling is inherently more dangerous than drilling on land or

in shallow waters.

5.     The BP defendants have a long history of ignoring crucial safety issues, including but not limited to safety issues related to the operation of offshore submersible rigs such as the Deepwater horizon oil rig, including problems with the crucial blowout preventer device that so spectacularly failed during this disaster.

6.     Nevertheless, the BP Board and the Company's executives have failed to adequately implement and monitor any effective safety initiatives on behalf of BP. These failures have cost employees their lives and made the Company incur billions of dollars in damages.

7.     The Deepwater Disaster will cause severe financial consequences to BP, which will be tabulated in the tens of billions of dollars at a minimum, including liability for damage to property, commercial interests and wildlife. These damages include estimated losses to the fishing industry of no less than $2.5 billion and to the tourism industry of no less than $3 billion. BP's liabilities in trying to stop the oil spill and remediate its effects are currently estimated at $22.2 billion.  This figure includes $20 billion for the escrow fund, a $100 million moratorium payment, $105 million of already-paid claims, and $2 billion already incurred (and steadily increasing) for the post-spill operation.  On April 19th, the day before the rig exploded, BP shares were priced at $59.48 on the New York stock exchange. Now they hover around the $30 mark. Extrapolating from those prices, BP was valued at about $186 billion (€150 billion) before the oil spill. Today it is worth half that - a loss of $93 billion.

8.     The consequences of the Deepwater Disaster will be felt by the families of the deceased and injured workers, commercial fishermen, Gulf coast property owners, and the environment at large for generations —for which losses the affected parties have, understandably, commenced several legal actions against the culpable parties, including many of the Defendants named herein.

9.      Plaintiff brings this action not only against the BP defendants, who are directors and officers of the Company, who disregarded their fiduciary duties of loyalty, care, oversight, and good faith with respect to the Company's very existence, but also against the third parties who may be held responsible for the effects of the Deepwater Disaster, including Transocean Ltd., the owner/operator of the rig, Cameron International Corporation, which manufactured the malfunctioning blowout preventer at issue, and Halliburton Energy Services, Inc., which was servicing the cement casing to seal off the wellhead at the time of the explosion. Whatever the liability of these defendants to third parties, these parties are liable to BP for their own negligence and other misconduct in causing the Deepwater Disaster and damaging the Company. Plaintiff asserts these claims because the BP defendants themselves, including the Board of Directors, cannot and will not do so.

## PARTIES

10.     Plaintiff Cody A. Nedved is a resident of the State of Missouri.  Mr. Nedved is a current shareholder of BP, has been a stockholder of BP at all material times alleged in this Complaint and will continue to be a stockholder of BP through the conclusion of this litigation.

11.     Nominal Defendant BP PLC ("BP") is a corporation organized and existing under the laws of the United Kingdom with its principal place of business in London, England. BP is one of the three largest integrated energy services companies in the world, with more than 100,000 employees and operations in more than 100 countries on six continents. BP is the largest U.S. oil and gas producer. BP does business in Louisiana and within this District.

12.     BP is incorporated under English law, which permits this action to be maintained based on the allegations herein. Moreover, due to BP's extensive U.S. and Louisiana operations, the large number of BP shareholders in the U.S., and the situs of the wrongdoing, this District is

manifestly the most appropriate venue for this action.

13.     BP's ties to—and impact on—the U.S. are highlighted by the following:

- 39 percent of BP's worldwide shareholders reside in the U.S.

- BP has approximately 34,000 employees in the U.S., one third of its total worldwide employees and more than in any other country.

- BP produces more crude oil in the U.S. than in any other country.

- BP produces more natural gas in the U.S. than in any other country.

- BP's capital expenditures in the U.S. are larger than in any other country, and

- BP has more operating capital employed in the U.S. than in any other country.

14.     Defendant Anthony B. Hayward is the Chief Executive Officer and a member of the Board of Directors. He has served as Chief Executive Officer since 2007 and as an Executive Director since 2003. Before becoming Chief Executive Officer, Hayward, who joined BP in 1982, served as the Chief Executive Officer of Exploration and Production from 2002 to 2007. In exchange for his purported trust, loyalty, and fidelity to BP, Hayward received a salary, performance bonus, non-cash benefits and other emoluments in the amounts of  ₤2,509,000 in 2008 and ₤3,158,000 in 2009. He is a citizen of the United Kingdom.

15.     Defendant Iain C. Conn has served as BP's head of refining and marketing since 2007 and as an Executive Director of the Board of Directors since 2004. He joined BP in 1986 and served in a variety of roles, including group vice president of BP's refining and marketing business from 2000 to 2002, chief executive of petrochemicals from 2002 to 2004, and group executive officer from 2004 to 2007, before being appointed head of refining and marketing. In exchange for his purported trust, loyalty, and fidelity to BP, Conn received a salary, performance bonus, non-cash benefits and other emoluments in the amounts of £1,586,000 in 2008 and £1,840,000 in 2009. He is a citizen of the United Kingdom.

16.     Defendant Robert W. Dudley has served as BP's Managing Director and Executive Director on the Board of Directors since April 2009. Dudley joined the Amoco Corporation, which merged with BP in 1998, in 1979. Before he was appointed Director, following a variety of posts, Dudley served as president and chief executive officer of a BP subsidiary from 2003 until 2008. In exchange for his purported trust, loyalty, and fidelity to BP, Dudley received a salary, performance bonus, non-cash benefits and other emoluments in the amount of $2,179,000 in 2009. He is a citizen of Texas.

17.     Defendant Byron E. Grote is Chief Financial Officer and a member of the Board of Directors. Grote joined BP in 1987 following the acquisition of The Standard Oil Company of Ohio, where he had worked since 1979. He was appointed an Executive Director of BP in 2000 and Chief Financial Officer in 2002. In exchange for his purported trust, loyalty, and fidelity to BP, Grote received a salary, performance bonus, non-cash benefits and other emoluments in the amounts of $3,090,000 in 2008 and $3,458,000 in 2009. He is a citizen of the United Kingdom.

18.     Defendant Andy G. Inglis is an Executive Director and Chief Executive of Exploration and Production. He has worked for BP in various capacities since 1980 and has held his current positions since 2007. In exchange for his purported trust, loyalty, and fidelity to BP, Inglis received a salary, performance bonus, non-cash benefits and other emoluments in the amounts of £2,055,000 in 2008 and £2,217,000 in 2009. He is a citizen of the United Kingdom.

19.     Defendant Carl-Henric Svanberg is the Chairman of the Board of Directors. He was appointed a Non-Executive Director of BP in September 2009 and became Chairman in January 2010. Svanberg also heads the Chairman's Committee and is a member of BP's Nomination Committee. In exchange for his purported trust, loyalty, and fidelity to BP,

Svanberg was paid £30,000 in 2009. Svanberg is a citizen of Sweden.

20.     Defendant Paul M. Anderson is a Non-Executive member of the Board of Directors. He joined the Board in February 2010 and is a member of the Chairman's Committee and the Safety, Ethics and Environment Assurance Committee. He is a citizen of Texas.

21.     Defendant Antony Burgmans joined BP's Board of Directors in 2004. He is a member of the Chairman's, Remuneration, and Safety, Ethics and Environment Assurance Committees. In exchange for his purported trust, loyalty, and fidelity to BP, Burgmans was paid £90,000 in 2008 and £93,000 in 2009. He is a citizen of the Netherlands.

22.     Defendant Cynthia B. Carroll is a member of BP's Board of Directors. Carroll has served on the Board since 2007 and is a member of the Chairman's and Safety, Ethics and Environment Assurance Committees. In exchange for her purported trust, loyalty, and fidelity to BP, Carroll was paid £93,000 in 2008 and £90,000 in 2009. She is a citizen of Texas.

23.     Defendant William M. Castell has been a member of BP's Board of Directors since 2006. Castell is a member of the Chairman's and the Nomination Committees and is Chairman of the Safety, Ethics and Environment Assurance Committee. In exchange for his purported trust, loyalty, and fidelity to BP, Castell was paid £108,000 in 2008 and £115,000 in 2009. He is a citizen of the United Kingdom.

24.     Defendant George David is member of BP's Board of Directors. He joined the Board in 2008 and is a member of the Chairman's, Audit and Remuneration Committees. In exchange for his purported trust, loyalty, and fidelity to BP, David was paid £100,000 in 2008 and £118,000 in 2009. He is a citizen of Connecticut.

25.     Defendant Ian Davis is a member of BP's Board of Directors. He joined the Board in April 2010 and is a member of the Chairman's, Remuneration, and Audit Committees.

He is a citizen of the United Kingdom.

26.    Defendant Douglas J. Flint has served as a Non-Executive Director on BP's Board since 2005. He is a member of the Chairman's and Audit Committees. In exchange for his purported trust, loyalty, and fidelity to BP, Flint was paid £90,000 in 2008 and £85,000 in 2009. He is a citizen of the United Kingdom.

27.    Defendant DeAnne S. Julius has served as a Non-Executive Director of BP since 2001. She is a member of the Chairman's and Nomination Committees and is Chairman of the Remuneration Committee. In exchange for her purported trust, loyalty, and fidelity to BP, Julius was paid £110,000 in 2008 and £105,000 in 2009. She is a citizen of the United Kingdom.

28.    The defendants set forth in the paragraphs immediately above are referred to as the "Director Defendants."

29.    Defendant H. Lamar McKay is Chairman and President of BP America, Inc. In 1980, McKay started with Amoco, which was acquired by BP in 1998, occupying a variety of positions until being appointed to his current roles in 2009. He is a citizen of Texas. McKay is referred to as the "Officer Defendant."

30.    The defendants set forth in the paragraphs immediately above (consisting of all Director Defendants and the Officer Defendant) are referred to as the "BP Defendants."

31.    The BP Defendants have fiduciary duties to the Company. These include the common-law obligations of trust, loyalty, good faith, oversight, and due care. The BP Defendants were and are required to use their utmost ability to control and manage BP in a fair, just, honest and equitable manner. The BP Defendants were entrusted to use their abilities faithfully to ensure the Company's best interests in the long term.

32.    In addition, the BP Defendants had duties under section 172 of the British

Companies Act of 2006 as follows:

(1) A director of a company must act in the way he considers, in good faith, would be most likely to promote the success of the company for the benefit of its members as a whole, and in doing so have regard (amongst other matters) to—

(a) the likely consequences of any decision in the long term,

(b) the interests of the company's employees,

(c) the need to foster the company's business relationships with suppliers, customers and others,

(d) the impact of the company's operations on the community and the environment,

(e) the desirability of the company maintaining a reputation for high standards of business conduct, and

(f) the need to act fairly as between members of the company.

33.     Defendant Transocean Ltd. is a leading international provider of offshore contract drilling services for oil and gas wells. Transocean Ltd. is organized and existing under the laws of Switzerland with its principal place of business in Vernier, Switzerland. Transocean Ltd. does business in Louisiana and within this District.

34.     Defendant Transocean Deepwater, Inc. is a subsidiary of Transocean Ltd. It is organized and existing under the laws of the State of Delaware with its principal place of business in Houston, Texas. Transocean Deepwater, Inc. does business in Louisiana and within this District.

35.     Defendant Transocean Offshore Deepwater Drilling, Inc. is a subsidiary of Transocean Ltd. It is organized and existing under the laws of the State of Delaware with its principal place of business in Houston, Texas. Transocean Offshore Deepwater Drilling, Inc. does business in Louisiana and within this District.

36.     Transocean Ltd., Transocean Deepwater, Inc., and Transocean Offshore Deepwater Drilling, Inc. are collectively referred to herein as "Transocean." As of February 2, 2010, Transocean owned, had partial ownership interests in or operated 138 mobile offshore drilling units. Transocean owns and operates the Rig, which it leases to BP.  At the time of the explosion, Transocean and BP were both in control of the Rig, with BP's employees providing instructions as to where and how to drill.

37.     Defendant Cameron International Corporation ("Cameron") is a leading provider of flow equipment products, systems and services to worldwide oil, gas and process industries. Cameron manufactured the blowout preventer on the Rig that failed to function correctly. After the Rig's explosion and leak, Cameron immediately filed an insurance claim and received over $400 million in proceeds from its insurance carriers. Cameron is organized and existing under the laws of Delaware with its principal place of business in Houston, Texas. Cameron does business in Louisiana and within this District.

38.     Defendant Halliburton Energy Services, Inc. ("Halliburton") is a leading provider of oilfield technology, including fluid management and technologies to assist in the drilling and construction of oil and gas wells. Halliburton was a subcontractor to the Rig, providing services to cement the well head to the sea floor, as supervised by BP employees under the direction and control of the BP Defendants. Halliburton is organized and existing under the laws of Delaware with its principal place of business in Houston, Texas. Halliburton does business in Louisiana and within this District.

39.     Defendants "TA through TZ" are insurance companies which provided policies of insurance to Transocean covering losses for which it might be liable to BP arising from the acts and omissions set forth herein.

40.     Defendants "CA through CZ" are insurance companies which provided policies of insurance to Cameron covering losses for which it might be liable to BP arising from the acts and omissions set forth herein.

41.     Defendants "HA through HZ" are insurance companies which provided policies of insurance to Halliburton covering losses for which it might be liable to BP arising from the acts and omissions set forth herein.

## JURISDICTION AND VENUE

42.     This Court has subject matter jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332 in that complete diversity exists between Plaintiff and each of the Defendants and the amount in controversy exceeds $75,000.

43.     The Court has personal jurisdiction over each of the Defendants because each either does business in Louisiana or has sufficient minimum contacts with Louisiana to justify this State's exercise of personal jurisdiction over him consistent with the laws of Louisiana and the United States Constitution.

44.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred here, and Defendants have received substantial compensation and other transfers of money in this District by doing business here and engaging in activities having an effect here.

## FACTUAL ALLEGATIONS

### BP Knew of the Inherently Increased Risks From Deepwater Drilling

45.     The risks of offshore deepwater drilling were well known to the BP Defendants, and are especially high in the Gulf, where floating rigs are used, unlike the permanent rigs used in other areas such as the North Sea. Permanent rigs are anchored to the ocean floor and cannot

11

sink, while floating rigs are far more precarious and subject to serious accidents.

46.     Those risks have continued to increase materially as rigs such as the Deepwater

Horizon have drilled to ever greater depths.

47.     Over the last decade, a number of studies have emphasized the danger from

deepwater drilling.  For example, in March 2000, MMS released an industry-wide safety alert

ordering companies drilling in deep water in the outer continental shelf to maintain effective

backup systems. The March 2000 notice stated:

> The MMS considers a backup [blowout preventer] actuation
> system to be an essential component of a deepwater drilling
> system, and therefore expects OCS operators to have
> reliable backup systems for actuating the [blowout preventer].

48.     MMS left it up to the individual companies to decide what kind of backup system

to use. The BP Defendants, however, chose not have a backup system, tested under operational

conditions, for activating the blow-out preventer at the Rig.

49.     A 2004 study performed by West Engineering Services, an engineering consulting

firm, singled out defendant Cameron, the manufacturer of the Rig's blowout preventer, for

relying on faulty calculations to determine the necessary strength for its blowout preventer

equipment to function properly at greater depths.

50.     A more extensive study by MMS showed that blowout preventers may not

function in deepwater drilling environments because of the increased force needed to

pinch and cut the stronger pipes necessary to drill at such great depths. "Development Of A

Blowout Intervention Method And Dynamic Kill Simulator For Blowouts Occurring In Ultra-

Deepwater,"[1] Final Project Report – Phase One Prepared for the Minerals Management Service

---

[1] Authored by Dr. Jerome J. Schubert, Texas A&M University, Dr. Peter Valko, Texas A&M University,
Dr. Serguei Jourine, Texas A&M University, Dr. Ray T. Oskarsen, John Wright Company, Mr. Sam
Noynaert, Texas A&M University, Mr. Hector Meyer, Texas A&M University, Mr. Steve Walls,

Under the MMS/OTRC Cooperative Research Agreement, 1435-01-99-CA-31003 Task Order 18132, Project Number 408 (December 2004) (hereinafter "MMS December 2004 Report").

51.     Essentially, the report found that, unlike onshore drilling where the frequency of blowouts remained flat and unrelated to the number of wells drilled, for offshore deepwater drilling, and despite so-called advances in BOP technology, the frequency of Gulf blowouts has not decreased.

52.     Appendix B of the report reiterated that despite the modernization of blowout prevention technology, the blowout rate had not decreased, and it placed the blame on the constant blowout rate on "complacent, careless drilling practices."  Appendix B, Chapter V, Conclusions and Recommended Future Research, at 96-97.

**BP's History of Poor Safety**

53.     From 2001 through 2007, BP was assessed $555,000 in fines by the Minerals Management Service for 11 separate violations in its Gulf of Mexico operations. Three of the eleven violations relate directly to well control, an issue with the current BP rig accident. Bruce Alpert, "BP Gulf of Mexico Operations Drew $555,000 in Fines From 2001 Through 2007," Times-Picayune, May 26, 2010.

54.     In 2004, for example, BP was fined $190,000 after a fire involving a diverter system which MMS said was not installed as directed in the "approved plan."

55.     In 2007, BP was fined $41,000 because the "operator failed to verify employees were trained to competently perform the assigned well control duties." In addition, MMS said, the company failed to "have a remote controlled station that could operate the valves in the flow and vent lines of the diverter."

---

Cherokee Offshore Engineering, Mr. Curtis Weddle, III, Cherokee Offshore Engineering.

56.     In recent years, the BP Defendants have sought to change the Company's image from just another oil company into one of "Beyond Petroleum"—i.e., a company that is environmentally conscious and wants to develop alternative energy sources like solar and wind power.

57.     However, in devising clever new ways to brand the Company, the BP Defendants recklessly let the crucial values of maintenance and safety fall into deep disarray and disuse. Safety and maintenance problems were endemic throughout the Company, including at the Rig. Moreover, additional safety mechanisms, technologies, and precautions were known and available to all Defendants, but Defendants chose not to employ them on the Rig.

58.     In 2005, an explosion and fire ripped through a tower at a BP refinery in Texas City, Texas, killing 15 people, injuring 170 others, and costing the Company over $1 billion to remediate. Investigators determined that BP had ignored its own protocols on operating the tower, which was filled with gasoline, and that a warning system had been disabled. The Company was forced to plead guilty to federal felony charges and was fined more than $50 million by the U.S. Environmental Protection Agency. In addition, BP officers signed a settlement with federal safety inspectors vowing to institute improvements, but in 2009 the federal Occupational Safety and Health Administration ("OSHA") imposed an $87 million fine—the largest in its history—on the Company for failing to correct the safety violations at the Texas City plant. OSHA also declared that BP had a "serious systematic safety problem" across the Company.

59.     In 2006, BP had to shut down part of its Prudhoe Bay oilfield in Alaska after oil leaked from a corroded pipeline. The Company had been warned to check the pipeline in 2002, but did not do so, only discovering four years later that a six-mile length of pipeline was

hopelessly corroded. The Company was fined $20 million in criminal penalties after prosecutors charged it with neglecting corroded pipelines. Moreover, a Congressional committee later determined that BP had ignored opportunities to prevent the spill and that "draconian" cost saving

measures had led to shortcuts in its operations. The incident led to the resignation under fire of The Lord John Browne of Madingley, BP's aristocrat CEO.

60.     When current CEO Defendant Anthony Hayward took office in 2007, he promised to change the Company's culture, with a renewed commitment to safety. The record shows this promise was an empty one, as Hayward and the other BP Defendants have led the Company on a furious expansion of its underwater drilling operations across the globe, coupled with severe cost-cutting measures heedless of safety and environmental concerns.

61.     Indeed, in 2009, when MMS proposed a rule that would have required companies to have their safety and environmental management programs audited once every three years, the BP Defendants lodged a formal objection on behalf of BP.

62.     Moreover, the BP Defendants actively opposed MMS's rules requiring oil rig lessees and operators to develop and audit their own safety and emergency management plans, insisting, against all evidence, that voluntary compliance would suffice. In 2009, the BP Defendants caused the Company to spend $16 million lobbying the federal government on issues including encouraging the removal of restrictions on drilling on the continental shelf, despite its history of spills and explosions and the BP Defendants' knowledge of the high risks involved in such drilling.

63.     The BP Defendants' stance has had its predictable consequences in the appalling safety record of the Company in 2009 alone. In the months before the Rig sank in a ball of fire,

the Company experienced four close calls on pipelines and facilities it operates in Alaska, as detailed in a January 14, 2010, letter written by two U.S. Congressmen, Rep. Bart Stupak and Rep. Henry Waxman, to the president of BP's Alaskan operations. These congressmen's letter specifically noted that the Company's efforts to cut costs could imperil safety at BP facilities. The letter, which was accompanied by a congressional document request and was referred to BP's legal department and the Safety, Ethics and Environment Assurance Committee of its Board of Directors, raised an unmistakable "red flag" that went ignored by the BP Defendants.

64.     Indeed, in the year before the Deepwater Disaster, BP had repeatedly and aggressively cut costs. In fact, a reorganization stripped 5,000 jobs from its payroll, saving BP more than $4 billion in operating costs.

65.     The congressmen had been investigating BP since the Prudhoe Bay incident in 2006. In their letter, the congressmen noted "several significant events" involving safety concerns in BP's Alaskan operations in the previous 15 months.

66.     After the 2005 explosion at its Texas City refinery, BP formed an independent panel to conduct a thorough review of the company's corporate safety culture, safety management systems, and corporate safety oversight at its U.S. refineries. *The Report of the BP U.S. Refineries Independent Safety Review Panel*, January 2007. The blue ribbon panel was chaired by former Secretary of State James A. Baker III. The Panel's conclusions are nothing less than an indictment of BP's Board of Directors. The Report concluded, in part, that BP had not effectively incorporated process safety considerations into management decision-making, and that their system did not provide adequate identification and "rigorous analysis" of safety hazards.  Moreover, the Report found

that many "of the process safety deficiencies are not new but were identifiable to BP based upon lessons from previous process safety incidents . . . ."

67.    The Baker Report is available on the BP website.

68.    In the aftermath of the Deepwater Disaster, Congress, as well as MMS, has commenced separate investigations of allegations that BP failed to keep proper documentation about how to perform an emergency shutdown of the Atlantis, another Gulf oil platform similar to the Rig.

69.    Even though deep water drilling in the Gulf is inherently more dangerous than drilling in other areas, because it is relatively near shore and the water is deeper, BP routinely indemnifies all its drillers, without distinction, including Transocean, for its Gulf drilling.

70.    Transocean's 10-K for its calendar 2009 fiscal year, filed on February 24, 2010, stated (at 18): "Consistent with standard industry practice, our customers generally assume, and indemnify us against, well control and subsurface risks under dayrate contracts. These are risks associated with the loss of control of a well, such as blowout or cratering, the cost to regain control of or redrill the well and associated pollution. However, there can be no assurance that these customers will be financially able to indemnify us against all these risks."

**The BP Defendants' Reckless Inattention to Safety and Maintenance Issues Reached a Climax on April 20, 2010**

71.    At the time of the Deepwater Disaster, the Rig was not producing any oil. The Rig had drilled a well in the sea floor and was in one of the last phases of the exploratory operation prior to turning the well into a production well.  In this final phase, Halliburton workers on the Rig, under the supervision and control of BP's employees, were attempting to create a cement seal to plug off the wellhead.  BP's employees, under the supervision and control

of one or more of the BP Defendants, had authority over the Halliburton workers to determine the type and amount of cement to be used.

72.     Cementing a wellhead, particularly in deep water, is delicate work that carries the risk of a blowout, or an uncontrolled release of oil and/or natural gas from the well. Indeed, the BP Defendants knew that the work being performed at the Rig was especially risky. In 2007, MMS raised concerns about oil rig blowouts associated with the exact type of cementing work the Rig was doing when it exploded. This information was known to BP's Safety, Ethics and Environment Assurance Committee, which took no steps to act on it.

73.     Although blowouts due to other causes were on the decline, the MMS study noted that blowouts during cementing work were continuing with alarming regularity, and most frequently of all in the Gulf. Cementing was a factor in 18 of 39 well blowouts in the Gulf between 1992 and 2006.

74.     Indeed, Halliburton bore responsibility for cementing a well off the coast of Australia that blew in August 2009, leaking oil for ten weeks before it was plugged. MMS is investigating that incident, and an MMS official has testified that a poor cement job likely caused the blowout. This information was known to BP's Safety, Ethics and Environment Assurance Committee, which took no steps to act on it.

75.     Moreover, a blowout preventer manufactured by Cameron and another company was the subject of a dispute between BP and Transocean in June 2000. In that incident, BP issued a notice of default to Transocean concerning the functioning of one of Transocean's oil rigs, in which the blowout preventer was the subject of concern. Defendant Hayward acknowledged the existence of this dispute in public comments on May 4, 2010. This information was known to BP's Safety, Ethics and Environment Assurance Committee, which

18

took no steps to act on it.

76.     In addition, the BP Defendants were aware of an August 2009 blowout in the Timor Sea, which was found to have been caused by careless cementing work. During that incident, which bears a strong resemblance to the Deepwater Disaster, oil leaked from the site for ten weeks, spreading damage over 200 miles from the well site. This information was known to BP's Safety, Ethics and Environment Assurance Committee, which took no steps to act on it.

77.     The threat of blowouts increases as drilling depth increases. Deepwater Horizon was drilling in 5,000 feet of water, to a total depth in excess of 20,000 feet. The BP Defendants were well aware of the high risk of blowouts from such deep drilling.

78.     Not only did the blowout preventer on the Rig fail to stop the flow immediately after the explosion on the evening of April 20th, but repeated attempts to engage the blowout preventer in the days and weeks that followed similarly have been to no avail.

79.     Worse, the BP Defendants failed to install at least two pieces of back-up safety equipment that would have stopped the leak even without the blowout preventer.

80.     First, the BP Defendants consciously elected not to install an acoustically activated remote-control shut-off valve, costing only $500,000,[2] to the well. Indeed, such acoustic switches are mandated in countries like Brazil and Norway, and are employed by companies such as Royal Dutch Shell and Total SA, but have not been legally required in the U.S. due to the lobbying efforts of the BP Defendants themselves as well as their counterparts at other companies.

81.     Second, the BP Defendants chose not to install a deep-water valve that would

---

[2] By contrast, the replacement cost of the Rig as a whole is $560 million. BP has so far incurred $350 million and is incurring at least an additional $6 million per day to try to contain the spill, and the total expenses of containment and clean-up could reach $10 billion.

have been placed about 200 feet under the sea floor. Much like blowout preventers, devices that are meant to seal leaks, this valve could have served as a cutoff of last resort in explosions.

82.     The BP Defendants ignored these precautions despite being well aware of the increased risk, from deep-sea drilling, of a failure of the primary blowout safety mechanism, the blowout preventer. BP's Safety, Ethics and Environment Assurance Committee knew this information, but took no steps to act on it.

83.     There were serious problems and safety concerns with the Deepwater Horizon rig, beginning at least 11 months before the explosion. According to the New York Times (Ian Urbina, "Documents Show Early Worries About Safety of Rig," May 29, 2010), internal documents from BP showed that as far back as June 22, 2009, BP engineers expressed concerns that the metal casing the company wanted to use might collapse under high pressure.  The casing was used anyway.  Concerns regarding the Rig continued into March 2010 when the blowout preventer was leaking fluid, according to BP records.

84.     Additional concerns surfaced shortly before the explosion, with the operation of the Rig, and particularly the installation of the final cement casing at the well-head prior to the conclusion of the exploratory phase of the well, being carried out by Halliburton and the BP Defendants with extreme recklessness.

85.     The concrete work did not achieve a complete seal, and natural gas started seeping into the well in the late stages.  According to the New York Times, employees working on the Rig experienced recurring problems with pockets of highly flammable natural gas forcing its way up the drilling pipes. BP did not view these incidents as problematic, but instead stated that the gas was likely only to create a "negligible" risk. The government, however, cautioned the Company that gas buildup was a genuine concern.  In the weeks leading up to the Deepwater

Disaster, so much natural gas rose to the surface that an emergency announcement called for a stop to all "hot work," meaning any welding, cooking or any other use of fire or igniters. Despite the dangers posed by the extreme gas build up, Halliburton nonetheless chose to employ a risky technique of creating its cement by mixing nitrogen gas into it to create a mousse-like compound. Employees on the Rig have suggested that workers were perhaps motivated to finish early in order to earn bonuses for finishing the job ahead of schedule.

86.     The *New York Times* also has reported, citing lawyers for environmental groups, oil rig workers, and commercial fishermen, that: "At least one worker who was on the oil rig at the time of the explosion on April 20, and who handled company records for BP, said the rig had been drilling deeper than 22,000 feet, ***even though the company's federal permit allowed it to go only 18,000 to 20,000 feet deep . . .***" (emphasis added).

87.     In an April 18, 2010 report to BP, "Halliburton warned that if BP didn't use more centering devices, the well would likely have 'a SEVERE gas flow problem.' Still, BP decided to install fewer of the devices than Halliburton recommended – six instead of 21." Ben Casselman and Russell Gold, "BP Decisions Set Stage for Disaster," Wall Street Journal, May 27, 2010.

88.     Fifty minutes before the well blew, flow indicators revealed that more fluid was coming out of the well than was being pumped in. Then, 41 minutes before the explosion while the pump was shut down for a "sheen test," the well continued to flow when it should not have and drill pressure rose – a troubling result, according to BP documents.

89.     The problems confirmed by BP include "the failure of its emergency disconnect system, the failure of its automated mode function or deadman switch, the failure of the BOP's shearing functions, and the failure of the remote operated vehicle interventions."

Jonathan Tilove, "BP's Internal Probe Finds Several Issues; Cementing, Blowout Preventer, Testing Among Problems," Times-Picayune, May 26, 2010 A01.

90.    The explosion occurred at approximately 10 p.m. on April 20, 2010. The Rig caught fire and sank two days later, at approximately 10 a.m. on April 22, 2010. Eleven workers were killed, and three seriously injured.

91.    The Rig was connected to the wellhead on the sea floor by a 5,000-foot pipe called a riser. As the Rig sank to the bottom, it pulled the riser down with it, bending and breaking the pipe before finally tearing away from it completely. The riser bent into a crooked shape underwater, and now snakes along the ocean floor and in the deepest waters slightly above it.  As a result, oil is now leaking into the Gulf of Mexico.

92.    Since the sinking of the Rig, A Joint Investigative Panel of the United States Coast Guard and the Minerals Management Service (hereinafter "Joint Hearings") has been holding hearings in Kenner, Louisiana to determine what went wrong.

**The Aftermath of the Deepwater Disaster**

93.    The BP Defendants' initial response to the Deepwater Disaster was lackluster and only intensified the damage.

94.    After the explosion, the BP Defendants attempted to downplay and conceal the severity of the oil spill. An initial leak estimate of 1,000 barrels (42,000 gallon) per day was found by government investigators to be a fraction of the actual leak amount. Moreover, the BP Defendants were slow and incomplete in their announcements and warnings to Gulf Coast residents and businesspeople about the severity, forecast, and trajectory of the oil spill.

95.    Shortly after the spill, it was estimated that between 12,000 and 19,000 barrels of oil per day were spilling into the Gulf of Mexico.  Now, Government and independent scientists

estimate that the rate has increased to 35,000 to 60,000 barrels of oil a day flowing from the well. Significantly, an internal BP document recently revealed that the worst case scenario spill-rate could be 100,000 barrels – or 4.2 million gallons – of oil per day.

96.     BP has not been able to stop the leaking oil from flowing.

97.     After several unsuccessful attempts to stop the oil leak using various methods, in early June, BP installed a cap over the leaking oil well.  The cap is designed to capture the leaking oil by siphoning oil up to a tanker on the surface.  Using this method, approximately 18,000 barrels of oil per day are captured, which means little in light of the 35,000 to 60,000 that are estimated to be leaking each day.

98.     This method, however, is not without flaw, as in the last week of June, an accident involving an underwater robot forced BP to remove the cap.  It was replaced on June 23, 2010 after eight attempts.  During the period when the cap was off, live video showed as much as 104,000 gallons of oil leaking into the water every hour.

99.     On May 10, 2010, BP Chief Operating Officer Doug Suttles admitted that the Company is woefully unprepared to mitigate the damage of the Deepwater Disaster due to the Rig's current location. Suttles stated "There's a lot of techniques available to us. The challenge with all of them is, as you said, they haven't been done in 5,000 feet of water." BP's attempts to contain the Deepwater Disaster confirm BP's lack of preparedness to deal with this disaster.

100.     The ever-expanding oil slick made landfall on the fragile Louisiana coastline on April 30, 2010, and balls of tar began washing up on an island three miles off the coast of Alabama on Saturday, May 8, 2010. The oil spill will continue to affect more and more of the Gulf coastline as it is driven landward by currents and winds.

101.     As the oil continues to make landfall along the Gulf Coast, it will cause severe

damage to the delicate wetlands and intertidal zones that line the coast of Louisiana, Mississippi, Alabama, and Florida, destroying the habitats where countless species of fish and marine life breed, spawn, and mature. The timing of this disaster makes it even more damaging, as May was spawning season for much seal life and migration time for the young of many species of shrimp and various pelagic fish species. Such devastation of so many species will severely damage and perhaps even destroy the livelihoods of many commercial fishing interests in the area. The National Oceanographic and Atmospheric Administration may soon declare a 6,800square-mile area a "fisheries disaster."

102.    In addition, the Gulf accounts for about one-fifth of the total U.S. commercial seafood production and nearly three-quarters of the nation's shrimp output. Nearly a third of all marine recreational fishing trips, including those part of the $1 billion-per-year sport fishing industry, take place on Gulf waters. In 2008, the 3.2 million recreational fishermen in the Gulf took 24 million fishing trips. All of these activities and business are now in serious jeopardy.

103.    "A further complication has been the undersea use of dispersants, said Ed Overton, an LSU consultant who has consulted on oil spills for three decades. Breaking the oil into small 'micro' droplets at that depth may be reducing its buoyancy, causing it either to sink to the bottom or stay suspended somewhere under the surface. Thus, these oil droplets may surface and wash up on the coast for years to come.

104.    There also may be health and environmental effects from the dispersant, Corexit, which BP is using. Corexit, the dispersant approved by the EPA to make the ocean look better, is an eye and skin irritant, is harmful by inhalation as well as in contact with skin and if swallowed, and may cause injury to red blood cells, kidney or the liver.  On May 20, 2010, the federal

government ordered BP to use a "less toxic and more effective dispersant" in its efforts to break up the oil gushing into the Gulf.

**The Consequences to BP**

105.    According to the Wall Street Journal, (Alex MacDonald, "BP: Oil Spill Cost Hits $2.35 Billion," Wall Street Journal Online, June 25, 2010), through the end of June, BP has spent $2.35 billion in responding to the oil spill.  This figure does not include the $20 billion escrow fund recently established.  Also according to the Wall Street Journal (Neil King Jr. and Melanie Trottman, "BP Risks Big Fines and Loss of Major U.S. Contracts," Wall Street Journal, May 28, 2010), under the U.S. Clean Water Act, the Environmental Protection Agency could seek civil penalties of up to $32,500 per violation each day, or $1,100 per barrel spilled if there is no gross negligence found. The government could also seek criminal penalties, which could be up to twice "the price-tag" put on any losses associated with damage and cleanup costs.

106.    Pursuant to the Oil Pollution Act of 1990, the federal government has assigned responsibility for the cleanup to BP. The Act provides for the recovery, among other things, of "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

107.    Although liability under federal law is capped under the Act at $75 million, legislation is moving through Congress that would raise the liability cap $10 billion and make that change retroactive—i.e., fully applicable to BP with respect to the Rig's leak.

108.    Moreover, even before legislative efforts were initiated to raise the cap, Defendant Hayward—in an implicit admission of liability—announced that BP would voluntarily pay in excess of the liability cap imposed by the Act to remediate the problem.

109. In a May 10, 2010 letter to the attorneys general of the five Gulf Coast states, BP's top U.S. lawyer John Lynch Jr. wrote that it "is BP's position that the cap on liability under the Oil Pollution Act is not relevant; BP will pay necessary cleanup costs associated with the spill and legitimate claims for other loss and damage." Mark Schleifstein, "Splitting The Bill For Spill Is Tricky; BP's Expenses Will Continue For Years," Times-Picayune, May 23, 2010 at A12.

110. BP is also exposed to statutory liability pursuant to the Louisiana Oil Spill Prevention and Response Act ("LOSPRA"). Pursuant to LOSPRA, the party responsible for an oil spill is liable for up to $350 million in damages arising from the discharge, and must pay all pollution removal costs and damages, regardless of any defenses it may assert.

111. In addition to statutory liability, an excess of one hundred lawsuits, including class actions, have been filed, which will expose BP to hundreds of millions, if not billions, of dollars in additional liability to private parties, including families of the workers, environmental groups, commercial fishermen, and property owners along the Louisiana, Mississippi, Alabama, and Florida coasts.

112. BP will also suffer from harm to its reputation and good will.

113. On June 1, 2010, U.S. Attorney General Eric Holder announced that federal authorities have opened criminal and civil investigations into the nation's worst oil spill.

114. All articles, reports, SEC filings, publications and other documents referred to herein are incorporated herein by reference.

## DERIVATIVE ALLEGATIONS

115. Plaintiff brings this action derivatively in the right and for the benefit of BP to redress injuries suffered, and to be suffered, by BP as a direct result of the BP Defendants'

breaches of fiduciary duties by virtue of the wrongs alleged herein and the misconduct of the other defendants. The claims herein arise from an actual or proposed act or omission involving negligence, default, breach of duty, and/or breach of trust by directors and/or former directors of BP, as well as the misconduct of other defendants. BP is named as a nominal defendant solely in a derivative capacity. Plaintiff seeks to assert solely causes of action vested in BP and seek relief solely on behalf of BP. Plaintiff has no individual standing to pursue the claims herein as direct claims against any of the Defendants.

116.    Plaintiff will adequately and fairly represent the interests of BP in enforcing and prosecuting its rights.

117.    Plaintiff has been an owner of BP common stock, at all relevant times and continues to own such stock at this time.

118.    Prosecution of this action, independent of the BP Board, is in the best interests of the Company.

119.    This action is not being used by Plaintiff to gain any personal advantage, nor does Plaintiff maintain any personal agenda other than seeking to correct the wrong that has been done to the Company. Plaintiff has not received, been promised, or offered, and will not accept, any form of compensation, directly or indirectly, for prosecuting or serving as representative parties in this action except such fees or other payments, including attorneys' fees, as the Court expressly approves to be paid to Plaintiff or on Plaintiff's behalf.

120.    To this end, Plaintiff has taken steps to commence this action and have retained counsel experienced in derivative litigation and corporate governance litigation. To the extent Court permission is required to continue this action, such permission is hereby sought, and this Complaint constitutes Plaintiff' prima facie case for obtaining such permission.

121.    The claims herein concern acts and omissions that were not authorized by BP but, rather, occurred as a consequence of the unauthorized and unratified failure of the BP Defendants to execute their fiduciary duties to the Company as well as the unauthorized and unratified acts of third parties also named as defendants.

122.    As of the date hereof, BP has not made a decision whether to pursue the claims herein, nor would any decision not to pursue the claims be entitled to deference. BP cannot act except through its Board of Directors, and the Board, all of whose members have been named as defendants herein, could not and would not objectively determine whether bringing these claims was in the best interests of the Company and its shareholders.

123.    First, the acts and decisions of the BP Board—as catalogued herein—constituted a breach of the Director Defendants' fiduciary duties of care, oversight, good faith, candor, and loyalty. These decisions were not, and could not have been, the product of the Board's good faith, informed business judgment. As such, and for this separate and independent ground alone, demand on the Board to bring these claims on the Company's behalf would be a futile gesture.

124.    Second, the Director Defendants have conclusively demonstrated their inability or unwillingness to pay due care to safety and maintenance issues at BP despite prior legal proceedings seeking to hold them to account for their failures in that regard.

125.    The failures at all levels of the Company leading to the Texas City Explosion, as well as the massive oil spill and complete pipeline shutdown at Prudhoe Bay, Alaska in 2006, together with other improprieties, were the specific subject of a shareholder derivative lawsuit brought against BP's Board of Directors and various officers in 2006. *See In re BP P.L.C. Derivative Litigation*, No. 3AN-06-11929CI (Alaska Super. Ct. filed Oct. 5, 2006) (the "Alaska Derivative Action").

126.     In the Alaska Derivative Action, the plaintiff, a holder of American Depositary Receipts of BP, sought recovery on behalf of the Company against its directors and officers, including many of the BP Defendants named herein. The plaintiff asserted that the defendants had breached their fiduciary duties to BP by, among other things, causing the Company to violate the laws of the U.S. and several states relating to environmental regulation and worker and workplace safety. In particular, the plaintiff alleged that the defendants resorted to improper and illegal activities to cut costs and temporarily boost BP's reported results—including refusing to make expenditures for necessary plant and equipment inspections, worker training, emergency response plans and procedures, and the maintenance and replacement of equipment. This pattern of improper conduct led inevitably to both the 2005 explosion in Texas City, Texas, and the 2006 Prudhoe Bay oil leak and their attendant curtailment of production, employee injuries, civil and criminal investigations, government fines (including the record $87 million fine by OSHA) and reputational damage.

127.     The defendants in the Alaska Derivative Action first sought to remove it to the United States District Court for the District of Alaska on the grounds that the plaintiff had "fraudulently" joined various defendants in an attempt to defeat federal jurisdiction. The plaintiff moved to remand the action, but before that motion could be decided, the defendants consented to a remand. The defendants thereupon filed motions to dismiss based on lack of standing, lack of personal jurisdiction, and *forum non conveniens*, all of which grounds were denied by the Alaska Superior Court in an extensive written opinion on May 18, 2007. The parties promptly entered into a settlement agreement.

128.     The settlement agreement in the Alaska Derivative Action required the defendants to agree to certain corporate governance changes at BP designed in part to prevent a recurrence

of the disregard of safety and maintenance problems at the Company. Such changes included making safety and environmental performance a component in determining executive compensation and requiring non-executive Board members to participate in a program of visits to the Company's operating sites to assist in their understanding of the importance of safety and environmental concerns. While purporting to implement the relevant reforms, the BP Defendants have merely gone through the motions, while ignoring the substance and import of the Alaska Derivative Action, which was to prevent further disasters like Prudhoe Bay and Texas City, Texas. Under the BP Defendants, as confirmed by the Rig's explosion and sinking, the Company has not experienced one iota of improvement in its workplace and environmental safety and still suffers from the same shoddy level of investment and resources in equipment maintenance and inspections, worker training, emergency response plans and procedures, and compliance with law.

129.   Thus, the Director Defendants, who cannot be trusted to carry out improvements and reforms called for in the court-approved settlement of a previous full-blown shareholder derivative lawsuit, *a fortiori* cannot be trusted to decide whether to bring the current claims in the first instance.

130.   Third, the Director Defendants face a substantial threat of liability for their breaches of fiduciary duty set forth herein. Indeed, the various Committees of the Board were specifically tasked with control and oversight over the very conduct that went so fatally awry at BP. Each of the Director Defendants sat on at least one—and in most cases, several—of the Board's Committees during the relevant period and thus had direct responsibility for ensuring various aspects of the Company's operations. Each of the Committees was charged with making regular reports to the Board of Directors.

131.    The members of BP's Safety, Ethics and Environment Assurance Committee were charged, among other things, with: (a) reviewing "the processes adopted by the executive management to identify and mitigate significant non-financial risks and receive assurance that they are appropriate in design and effective in implementation"; (b) "monitoring and obtaining assurance that the management of mitigation of significant BP risks of a non-financial nature is appropriately addressed"; (c) "reviewing material to be placed before shareholders which address BP's environmental, safety and ethical performance and making recommendations to the board about their adoption and publication"; (d) "reviewing BP's internal control systems as they relate to non-financial risk"; and (e) "reviewing reports on the group's compliance with its code of conduct and on the employee concerns programme". The members of the Safety, Ethics and Environment Assurance Committee are defendants Castell (chair), Anderson, Burgmans, and Carroll. By virtue of the fact that each member of this committee was charged with overseeing the Company's safety and environmental law compliance, ethics, and risk mitigation, among other things, defendants Castell, Anderson, Burgmans, and Carroll are personally implicated by the allegations contained herein and they would have been unable to comply with their fiduciary duties to disinterestedly determine whether to bring these claims.

132.    The members of BP's Audit Committee were charged, among other things, with: (a) "reviewing the effectiveness of BP's . . . internal control and risk management"; (b) "monitoring and obtaining assurance the management and mitigation of significant risks of a financial nature facing BP are appropriately addressed"; and (c) "monitoring and reviewing the effectiveness of BP's internal audit function". The members of the Audit Committee are defendants Flint (chair), David, and Davis. By virtue of the fact that each member of this committee was charged with ensuring that BP's accounting and reporting practices ensured that

all potential liability was accurately calculated and reported to the Company's investors, and it

was not, defendants Flint, David, and Davis are personally implicated by the allegations

contained herein and they would have been unable to comply with their fiduciary duties to

disinterestedly determine whether to bring these claims.

133.    Fourth, the five executive (or "inside") directors of BP are unable to objectively

determine whether to bring these claims in all events.

134.    BP's Remuneration Committee is charged with determining the salaries, bonuses

("performance-based variable pay"), stock awards, and other remuneration of each of the

"inside," executive directors of the Company. The remuneration to be given to these executive

directors—namely, defendants Hayward, Conn, Dudley, Grote, and Inglis—is purportedly based

on "key safety measures (15% of bonus), staff numbers and survey results to reflect the people

priorities (15%) and a set of financial and operational targets to measure performance (70%)."

135.    "Inside" directors Hayward, Conn, Dudley, Grote, and Inglis are executive

officers of BP who depend for their livelihoods on their positions, careers, and remuneration

from BP. These defendants were very handsomely compensated in 2009, as reflected in the

remuneration committee's annual report:

| Defendant | Salary | Bonus | Other | Total | Value of Stock Awarded |
|-----------|--------|-------|-------|-------|------------------------|
| Hayward | £1,045,000 | £ 2,090,000 | £23,000 | £3,158,0 | £852,000 |
| Conn | £ 690,000 | £1,104,000 | £1,104,000 | £1,840,000 | £551,000 |
| Dudley | $ 1,000,000 | $1,125,000 | $304,000 | $2,179,000 | n/a |
| Grote | $1,380,000 | $2,070,000 | $ 8,000 | $ 3,458,000 | $933,000 |
| Inglis | £ 690,000 | £1,311,000 | £216,000 | £2,217,000 | £483,000 |

Because their remuneration and livelihood for 2010 will be severely effected by the safety, financial, and operational impact from the Rig's disaster that will constitute a full 85 percent of their bonus, these "inside" directors are not capable of objectively and disinterestedly deciding whether to bring these claims.

136.    Indeed, the "inside" directors are beholden to members of BP's Remuneration Committee, who are themselves conflicted from objectively considering whether to bring these claims. The members of BP's Remuneration Committee are defendants Julius (chair), Burgmans, David, and Davis. A majority of the Remuneration Committee (Burgmans, David, and Davis) thus consists of audit (David and Davis) and Safety, Ethics and Environment Assurance Committee members (Burgmans) who face a substantial likelihood of personal liability for these claims and cannot objectively determine whether to commence a legal action on them. Thus, the "inside" directors Hayward, Conn, Dudley, Grote, and Inglis will have their compensation determined by directors who themselves are liable (Burgmans, David, and Davis) and accordingly are beholden to the latter, providing yet additional reasons why these "inside" directors cannot objectively determine whether to bring these claims.

137.    Fifth, BP is a defendant in literally scores of lawsuits, both in the Gulf and across the country, including class actions, seeking to hold the Company liability for billions of dollars in damages as a result of the Rig's fire and oil spill, including damages for wrongful death and bodily injury, damages to real and personal property, damages to commercial interests (including tourism, commercial fishing, and recreational fishing, wholesale seafood distribution), damages to maritime activities, and environmental damages. This includes at least 64 separate lawsuits in this District alone.

138.    On June 2, 2010, the U.S. Justice Department opened a criminal and civil

investigation into the matter and A.G. Holder promised to "prosecute to the fullest extent of the law." Specifically, DOJ is investigating whether violations of the Clean Water Act and Oil Pollution Act of 1990 occurred.

139.    The Director Defendants cannot reasonably be expected to defend BP itself against allegations of misconduct in these actions while simultaneously pursuing these claims against officers, directors, and employees of BP for the same or very substantially related misconduct. In light of the vast number of claims in these lawsuits seeking to hold BP liable, it is not possible for the Director Defendants in this case, who constitute the entire Board, to impartially consider whether to bring these claims. If the Company pressed forward with its rights of action against the defendants in this case, then the Company's efforts would undercut or even compromise the defense of the other lawsuits.

## CLAIMS FOR RELIEF

### COUNT I
**(Derivatively Against the BP Defendants for Breach of Fiduciary Duty)**

140.    Plaintiff incorporates by reference the allegations contained above, as though fully set forth herein.

141.    By reason of their fiduciary relationships, Defendants owed the Company and its shareholders the highest obligation of good faith, fair dealing, loyalty, oversight, and due care.

142.    Defendants, and each of them, violated and breached their fiduciary duties by, among other things: (a) causing BP to violate applicable law, disregarding their duties as fiduciaries; (b) causing BP to violate core worker safety and environmental laws and exposing the Company and its shareholders to criminal liability and unnecessary costs, fines, penalties, and tort liability; (c) exposing the Company and its shareholders to massive fines, penalties, and compensatory damages awards for violations of U.S. and state environmental laws; and (d)

subjecting BP to adverse publicity and loss of goodwill, greatly increased costs of capital, and impaired earnings.

143.    The BP Defendants, in their roles as executives and/or directors of the Company, participated in the acts of mismanagement alleged herein and/or acted in gross disregard of the facts and/or failed to exercise due care to prevent the unlawful conduct.

144.    As a direct and proximate result of the BP Defendants' failure to perform their fiduciary obligations, including the failure to maintain a system of internal controls adequate to insure the Company's compliance with all applicable laws, BP has suffered significant damages, including a drastic diminution in its reputation, good will, and the value of its assets.

145.    As a result of the misconduct alleged herein, each of the BP Defendants is liable to the Company for the payment of money damages.

**COUNT II**
**(Derivatively Against the BP Defendants for Waste of Corporate Assets)**

146.    Plaintiff incorporates by reference the allegations contained above, as though fully set forth herein.

147.    As a direct result of the wrongdoing alleged herein, the BP Defendants have unreasonably and unnecessarily caused BP to expend billions of dollars of corporate assets, and have subjected the Company to additional liability in the untold billions of dollars, to the extreme detriment of the Company.

148.    Additionally, as set forth above, the BP Defendants have awarded themselves excessively lucrative compensation which has no reasonable basis, but instead is designed only to enrich themselves in spite of their perfidious stewardship and the Company's dismal performance.

149.    As a direct and proximate result of the BP Defendants' waste of corporate assets

as alleged herein, BP has sustained damages.

## COUNT III
### (Derivatively Against All Defendants for Contribution)

150.    Plaintiff incorporates by reference the allegations contained above, as though fully set forth herein.

151.    The conduct of Defendants has exposed BP to significant liability.

152.    BP's liability on account of the wrongful acts and practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal, and/or bad faith acts and omissions of the BP Defendants and the reckless or negligent acts and omissions of Transocean, Cameron, and Halliburton.

153.    BP is entitled to contribution and indemnification from each of the Defendants in connection with all such claims that have been, are, or may in the future be asserted against BP by virtue of Defendants' wrongdoing. In addition, BP is entitled to contribution and indemnification from each of "TA" through "TZ" Insurance Companies, "CA" through "CZ" Insurance Companies, and "HA" through "HZ" Insurance Companies for the proceeds of any insurance coverage paid to Transocean, Cameron, or Halliburton, respectively, in respect of the acts and omissions alleged herein.

## COUNT IV
### (Derivatively Against Transocean
### for Aiding and Abetting Breaches of Fiduciary Duty)

154.    Plaintiff incorporates by reference the allegations contained above, as though fully set forth herein.

155.    As alleged above, the Director Defendants and the Officer Defendant have breached their fiduciary duties to BP.

156.    Defendant Transocean, as a substantial participant in the Deepwater Disaster,

knew that the Director Defendants and the Officer Defendant breached their fiduciary duties to BP.

157.    As a direct and proximate result of Transocean's conduct concerning the Deepwater Disaster, Transocean aided and abetted one or more of the other defendants in breaching fiduciary duties owed to BP.

158.    As a direct and proximate result of Transocean's conduct aiding and abetting the breaches of fiduciary duty, BP engaged in imprudent and unlawful activities which have caused BP to suffer damages, and Transocean is monetarily liable to BP.

**COUNT V**
**(Derivatively Against Cameron**
**for Aiding and Abetting Breaches of Fiduciary Duty)**

159.    Plaintiff incorporates by reference the allegations contained above, as though fully set forth herein.

160.    As alleged above, the Director Defendants and the Officer Defendant have breached their fiduciary duties to BP.

161.    Defendant Cameron, as a substantial participant in the Deepwater Disaster, knew that the Director Defendants and the Officer Defendant breached their fiduciary duties to BP.

162.    As a direct and proximate result of Cameron's conduct concerning the Deepwater Disaster, Cameron aided and abetted one or more of the other defendants in breaching fiduciary duties owed to BP.

163.    As a direct and proximate result of Cameron's conduct aiding and abetting the breaches of fiduciary duty, BP engaged in imprudent and unlawful activities which have caused BP to suffer damages, and Cameron is monetarily liable to BP.

**COUNT VI**
**(Derivatively Against Halliburton**
**for Aiding and Abetting Breaches of Fiduciary Duty)**

164.    Plaintiff incorporates by reference the allegations contained above, as though fully set forth herein.

165.    As alleged above, the Director Defendants and the Officer Defendant have breached their fiduciary duties to BP.

166.    Defendant Halliburton, as a substantial participant in the Deepwater Disaster, knew that the Director Defendants and the Officer Defendant breached their fiduciary duties to BP.

167.    As a direct and proximate result of Halliburton's conduct concerning the Deepwater Disaster, Halliburton aided and abetted one or more of the other defendants in breaching fiduciary duties owed to BP.

168.    As a direct and proximate result of Halliburton's conduct aiding and abetting the breaches of fiduciary duty, BP engaged in imprudent and unlawful activities which have caused BP to suffer damages, and Halliburton is monetarily liable to BP.

**COUNT VII**
**(Derivatively Against Transocean for Breach of Contract)**

169.    Plaintiff incorporates by reference the allegations contained above, as though fully set forth herein.

170.    At all times relevant hereto, Transocean and BP were parties to written contracts pursuant to which Transocean agreed to provide offshore contract drilling services to BP.

171.    Transocean breached its contracts with BP by, among other things, failing to render services in accordance with the contracts, and by breaching its duty of good faith and fair dealing, as set forth herein.

172.    As a direct and proximate result of Transocean's breaches of contract, BP has suffered damages and exposed BP to significant liability.

## COUNT VIII
### (Derivatively Against Cameron for Breach of Contract)

173.    Plaintiff incorporates by reference the allegations contained above, as though fully set forth herein.

174.    At all times relevant hereto, Cameron and BP were parties to written contracts pursuant to which Cameron agreed to manufacture the blowout preventer on the Rig that failed to function correctly.

175.    Cameron breached its contracts with BP by, among other things, failing to render services in accordance with the contracts, and by breaching its duty of good faith and fair dealing, as set forth herein.

176.    As a direct and proximate result of Cameron's breaches of contract, BP has suffered damages and exposed BP to significant liability.

## COUNT IX
### (Derivatively Against Halliburton for Breach of Contract)

177.    Plaintiff incorporates by reference the allegations contained above, as though fully set forth herein.

178.    At all times relevant hereto, Halliburton was a subcontractor to the Rig, providing services, under written contracts, to cement the well head to the sea floor.

179.    Halliburton breached its contracts with BP by, among other things, failing to render services in accordance with the contracts, and by breaching its duty of good faith and fair dealing, as set forth herein.

180.    As a direct and proximate result of Halliburton's breaches of contract, BP has

suffered damages and exposed BP to significant liability.

## COUNT X
### (Professional Negligence Against Transocean)

181.    Plaintiff incorporates by reference the allegations contained above, as though fully set forth herein.

182.    In rendering professional services as BP's partner in the Deepwater Horizon Rig, Transocean owed a duty to BP to plan, structure and perform its work in a professional manner, using the degree of care normally used and expected in reasonably prudent companies in their profession.

183.    BP relied to its detriment on Transocean.

184.    Defendant Transocean breached its duties of professional care in that it failed to plan, structure and perform its work in a professional manner and failed to use the degree of care normally expected of reasonably prudent companies in its profession.

185.    As a direct, foreseeable, and proximate result of Transocean's breaches, BP has suffered damages and exposed BP to significant liability.

## COUNT XI
### (Professional Negligence Against Cameron)

186.    Plaintiff incorporates by reference the allegations contained above, as though fully set forth herein.

187.    In rendering professional services as BP's partner in the Deepwater Horizon Rig, Cameron owed a duty to BP to plan, structure and perform its work in a professional manner, using the degree of care normally used and expected in reasonably prudent companies in their profession.

188.    BP relied to its detriment on Cameron.

189.     Defendant Cameron breached its duties of professional care in that it failed to plan, structure and perform its work in a professional manner and failed to use the degree of care normally expected of reasonably prudent companies in its profession.

190.     As a direct, foreseeable, and proximate result of Cameron's breaches, BP has suffered damages and exposed BP to significant liability.

## COUNT XII
### (Professional Negligence Against Halliburton)

191.     Plaintiff incorporates by reference the allegations contained above, as though fully set forth herein.

192.     In rendering professional services as BP's partner in the Deepwater Horizon Rig, Halliburton owed a duty to BP to plan, structure and perform its work in a professional manner, using the degree of care normally used and expected in reasonably prudent companies in their profession.

193.     BP relied to its detriment on Halliburton.

194.     Defendant Halliburton breached its duties of professional care in that it failed to plan, structure and perform its work in a professional manner and failed to use the degree of care normally expected of reasonably prudent companies in its profession.

195.     As a direct, foreseeable, and proximate result of Halliburton's breaches, BP has suffered damages and exposed BP to significant liability.

## COUNT XIII
### (Derivatively Against Transocean, Cameron, and Halliburton for Constructive Trust)

196.     Plaintiff incorporates by reference the allegations contained above, as though fully set forth herein.

197.     To the extent Transocean, Cameron, or Halliburton have received or will received

proceeds from payments on insurance claims submitted to their carriers "TA" through "TZ" Insurance Companies, "CA" through "CZ" Insurance Companies, and "HA" through "HZ" Insurance Companies, respectively, the proceeds should be held in a constructive trust for the benefit of BP in respect of the acts and omissions alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Awarding money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the misconduct complained of herein, together with prejudgment interest, structured in a fashion to ensure that Defendants do not participate herein or benefit hereby.

B.     Directing Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their misconduct, including all salaries, bonuses, fees, stock awards, options, and common stock sale proceeds, and imposing a constructive trust thereon.

C.     Directing Defendants to take all necessary actions to comply with La. RS 6:337, its predecessor La. RS 10:9-211, and all applicable Louisiana statutes and jurisprudence, including but not limited to Louisiana's laws prohibiting unjust enrichment and conversion.

D.     Directing BP to take all necessary actions to reform and improve its corporate governance and internal procedures, including putting forward for a shareholder vote resolutions for amendments to the Company's articles of incorporation and by-laws, and taking such other actions as may be necessary to place before shareholders for a vote the following corporate governance policies:

1.	limiting the number of inside, executive directors on the Board of Directors to two;

2.	strengthening the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board with respect to supervision of operations;

3.	establishing an environmental and litigation exposure oversight committee, staffed entirely by independent, non-executive directors and provided with adequate financial resources to retain independent counsel and advisors;

4.	permitting shareholders to nominate at least three candidates for election to BP's Board of Directors;

5.	testing and strengthening the internal audit and control functions;

6.	controlling and limiting improper payments of unearned compensation, corporate benefits, stock awards, and other emoluments, including instituting a performance-based "delay and claw-back" policy whereby the payment of bonuses and other incentive-based compensation paid to Company officers is delayed for a definite period, and/or is subject to return to the Company, pending determination whether the Company operated without serious environmental or litigation exposure for the period in question;

7.	requiring full compliance with Sarbanes Oxley;

8.	permitting shareholders to question all executive directors of BP at the annual general meeting and establishing a more transparent process for receiving and evaluating shareholder proposals.

E.	Awarding punitive damages.

F.      Declaring that BP is entitled to contribution and indemnification from all

Defendants, and imposing a constructive trust on the insurance proceeds received by Transocean,

Cameron, or Halliburton from their insurance carriers named as anonymous defendants herein.

G.      Awarding costs and disbursements of this action, including reasonable

attorneys', accountants', and experts' fees.

H.      Granting each other and further relief as this Court may deem just and

proper.

Dated: July 13, 2010                        *Respectfully submitted by*,

                                            **SUTTON & REITANO, APLC**
                                            By:  /s/ Lionel H. Sutton, III
                                            Lionel H. Sutton, III
                                            610 Baronne Street
                                            New Orleans, LA  70113
                                            Tel: (504) 592-3230
                                            Fax:  (504) 585-1789
                                            Email: lhs3law@hotmail.com

                                            **RYAN & MANISKAS, LLP**
                                            Richard A. Maniskas (Pro hac vice to be filed)
                                            Ryan & Maniskas, LLP
                                            995 Old Eagle School Rd., Suite 311
                                            Wayne, PA 19087
                                            Tel: (484) 588-5516
                                            Email: rmaniskas@rmclasslaw.com

                                            **POGUST BRASLOW MILLROOD**
                                            Harris L. Pogust (Pro hac vice to be filed)
                                            8 Tower Bridge, Suite 1520
                                            161 Washington Street
                                            Conshohocken, PA 19428
                                            Tel: (610) 941-4204
                                            Fax: (610) 941-4245
                                            Email: hpogust@pbmattorneys.com

                                            **SALTZ MONGELUZZI BARRETT &**
                                            **BENDESKY, P.C.**
                                            Simon Bahne Paris (Pro hac vice to be filed)

One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
Tel: (215) 496-8282
Fax: (215) 496-0999
Email: sparis@smbb.com